Good morning, and you may proceed, Counsel, with your argument. Thank you. My name is Jack Batson, and I represent the plaintiff seen in this case, Donald Grochowski. This case asked us to address the issue of whether the Eleventh Circuit should adopt the Kingsley standard of objective reasonableness as to conditions and systems cases. We believe that that would be the correct thing to do because Kingsley itself relied upon Bell, which was a conditions case. Also, Kingsley came about in the context of assaults on detainees by guards. This is a case where the conditions and systems caused an assault on the plaintiff by detainees. So they're both assault cases, and the only difference is Kingsley is a condition case. There's a big difference. In Kingsley, the assault is by the State actor himself, and in our case, the assault is by another person, and you're trying to hold the State liable. So in that layer, even if we were to apply Kingsley, which was a Fourth Amendment issue of arrest, to prison situations of custody, which is, I think, kind of a big leap in the first place, but even if we were going to do that, it seems to me it's very different to say we're going to eliminate a subjective requirement when your liability is not for something you did, and in that context, we might say you intended the natural consequence of your action, and that might negate the need for intent. Here, it is not your action that you're being held responsible for. It is the resulting action of an assault by someone else. And so all of a sudden, I think intent becomes more important, that you intended that other action by someone else and enabled it by your jail conditions. All right. Let's first address the fact that what's happening in our case is we're having corporal punishment assaults being levied by detainees. Our Constitution allows for only one kind of corporal punishment, and that's the death penalty. The Constitution does not allow in any corporal punishment imposed by detainees. But isn't that why intent becomes so important? I mean, you're not arguing here that these jailers intended that there be a death here. The issue is whether they are either objectively unreasonable to substantial risks of harm or the outcome is absolutely foreseeable in a prison context. This is a case in which all the people who are asked about it, it's obvious that fights occur in prisons. It's obvious that when a fight occurs, serious and substantial injury can occur. The number one rule of prison and jail administration is to prevent, detect, and stop assaults. What clearly established law would have put the supervisory defendants on notice that the things that you are quarreling with violated the Constitution? One thing you want to do is apply Kingsley here, but we've got circuit cases, public circuit cases, where we've refused to do that. We haven't addressed it and did not apply it to a medical indifference claim in Dang v. Sheriff. And so I want to know what it is that would have put the supervisors on notice. First, you claim that the jails must have some procedure for classifying inmates. They had some method. Maybe it wasn't good enough, but I'm not sure you can point to any case holding that the jail's objective classification system was constitutionally inadequate. Is there any case that would have put them on notice that their procedure for classifying inmates was constitutionally defective? The issue there is a much more practical one in that you go back to the history of classification in and of itself. Classification has not only do you look at the paper record, but both of our experts testified that absolutely you have to have a face-to-face interview. The fact that this county did not have a face-to-face interview was absolutely shocking. Every place I've ever else been, there's a face-to-face interview. So they were — they were constrained by their conditions because they couldn't — they were — they, in effect, had created a system where no individual jailer would have subjective knowledge of the dangers of the detainee about to be put in the cell with the other detainee. And that is the reason we have to impose an unreasonable or an objective unreasonableness standard, because that way it promotes the constitutional protection of the detainees from the corporal punishment. The subjective standard allows for creating of systems whereby people can turn a blind eye to it, or just by the mere system itself, it's fragmented and they don't have intent, they don't know of — or have the power to correct the situation. You used or, the word or, but the question isn't under Kingsleaf whether there should be an objective or a subjective. The question is whether there should be an objective and subjective or only an objective. I think that under Kingsleaf, you can't — if you have — Plus the point that my colleague mentioned that the Supreme — that the Eleventh Circuit on a couple of occasions has simply declined the invitation to adopt Kingsleaf to this circumstance. So I guess you have to address those cases, too. Those are — those medical cases are different, because you have situations in which jailers are not medical people. Jailers — and in the context of use of force and assaults, jailers are there to prevent assaults. There's a — that was clearly established that fairly put them on notice. And we've never applied Kingsley excessive force standard. Maybe we should. Maybe we will. But I don't think we have ever applied Kingsley to a conditions case like this. The issue is — Is that correct, or do I have that wrong? That's correct. The issue here is not that issue. Forever, the Constitution has said that the State, when it puts people in prisons, has a duty to prevent assaults on other detainees. That duty — Stated at that high order of abstraction, that is clear as a bell. Yes. But you say — And — Bear with me. Bear with me. Sure. You say, for example, that the double-selling process was unconstitutional. I do not say that in the abstract. I say that in the circumstances. Okay. So, because as an abstract matter, we've said, the Supreme Court of the United States has said, double-selling in and of itself is not unconstitutional. So what would have put them — The reason — what I'm getting at is, you complain about the following things. The classification of the inmates, the hourly checks, the double-selling of the inmates, and you say — and the — how the prison was designed and constructed. That's at the heart of what you say is wrong here. And I'm just trying to find out what would have put these folks on notice, that the way they double-selled, the way they classified, the way they did hourly checks, and the way they designed the prison was constitutionally defective, and they sure should have known that on the front end. Because it is — they all testified to a person that it is obvious that detainees fight. It is obvious that when a fight occurs, serious injury will result. It is obvious that when you put two detainees in a cell with a closed door, the solid front door through which a guard cannot — that — yes, there was. And that fact puts them on notice. Why do we have this emergency bell? It's because we know there will be fights in these cells. There are other reasons for those cell — those buzzers. But those buzzers — So if I have this right, the problem here was not that they didn't have a buzzer. It's not that they couldn't put two people in a cell. It's that they had no business putting this misdemeanant in the cell with the decedent. This misdemeanant who had — Under these circumstances, they had to know that how it has applied to this case was likely to yield a terrible result, and therefore, they should not have — they should have had some system in place to avoid this problem. They should have had a system whereby a correctional officer sits down with the person, talks to them about their record, maybe examines some circumstances. Right. So the whole problem really boils down to what they didn't do on the front end when they stuck these two guys together in the cell. Correct. Everything else standing alone would have been okay, or at least they wouldn't have been put on notice that it was not. Well, in the combination that they have there with those solid front doors, they know that they have a substantial risk of harm to any two people inside that cell when those doors are shut because the guards cannot see in there to detect or prevent fights. So it's not enough to go in every hour. They've got to have a glass window sufficient that at all times they can see in? No. I think our expert testified that rounds should have been about every 15 minutes. The critical thing that both experts agreed upon was this up-front prescreening. Right. Is this person — So that's at the heart of it. That's the heart of it. I've got it. Okay. And the — it's always been — With regard to that, what is the allegation about what they would have found out on the face-to-face interview that they didn't know? Or is there an allegation? Yeah. Our expert said that you could tell, number one, from the frequency of the arrests for disruption and assault kind of things and his young age, that this guy had some problems. But wouldn't that have been in the paper record they looked at? No. That would have been the beginning of the conversation where you ask him, what happened? Why did you get in a disruption with this person that they had to call the law? So they needed to go — And then you would — They needed to go over his criminal record with him face-to-face to adequately assess. I'm just trying to understand your position. Yes. Yes. And part of the reason is, if he lied to the medical people about being assaulted, a correctional officer who has access to the criminal record can tell that this guy is lying about this, that, or the other thing, which is another reason to not trust them. Because the issue for a correctional officer is this. You're not guaranteeing that there won't be a risk when you put two people in this cell. But what you're trying to do is eliminate the substantial risk created by someone who is disruptive. And when the officer — So your main claim is they should have had the face-to-face interview. That isn't the main claim. That's — that is — that is — it's part of the conditions and process where we end up. Right. I understand. Okay. Putting them in the same cell, no window. Well, there was a window. It just — you couldn't see it from the tower. Yeah. Tower is 70 feet away. It's, you know, arbitrary and capricious. And there's no — there's no evidence, as I understand the record, that the emergency bell was not working. That the emergency bell played no role in this. But it does matter. I don't know that it's outcome-determinative that there was a bell and it was never buzzed. Is that correct? That's correct. And if you look at the Goodman case, the Goodman case shows us how ineffective the bell — the buzzer bell situation was. Both — our expert, at least, testified that guards should have contact with what's going on inside that cell, whether it's visual or auditory. Because that's the only way you can tell whether there's going to be a fight. Now, there are — Okay. And my last question is, again, it's a record question. I just figured out last night, it just — I didn't realize this before, that this death was in 2012, correct? Yes. All right. So Kingsley wasn't decided until 2015. So it can't establish anything in this case under our precedent. Can you help me with that? Or you can think about it on rebuttal. I think — Most of our cases would be post-Kingsley. But I just figured out last night that this death was 2012, and Kingsley wasn't even out there at the time. So I'm not sure we can do anything about that. There's a constitutional error in how the district court decided the case. The district court decided the case based on we had to show that the conditions were intended to punish. The Supreme Court has never held that the conditions were intended. Right. But you cannot rely on Kingsley is the only point that Judge Hull is making. And you agree with that? I agree with the — I don't know. I don't know if Kingsley is not retroactive when it comes to conditions cases. I don't know that. I haven't researched that. Because — I don't mean to cut you. Kingsley — You've answered my question. I don't mean to cut you off. I just want to make sure I was right in my thinking it was a 2012 death, homicide. Well, if you go back to our Fifth Circuit cases of Jones v. Diamond and — I got what you say is no matter without Kingsley, you still say the district court applied the wrong standard. Yes. Okay. If you're going to go on at this point, we'll have you eat into your rebuttal. I'm sorry? I said at this point, if you want to continue on your direct argument, you will eat into your rebuttal time. Okay. Thank you. And you're eight minutes over, so no. We are trying to give you a lot of time, Mr. Batson. May it please the Court. Ali Sabzavari here on behalf of the Appalese. The district court's ruling granting summary judgment to the supervisory defendants, former Sheriff Kim Kimbrough, Garland Watkins, Robert Sowell, and Samuel Smith, should be affirmed based on the doctrine of qualified immunity. Similarly, summary judgment in favor of Clayton County should be affirmed based on the appellant's inability to present evidence to meet the high burden of proof required under Monell. I want to first address Kingsley very briefly. As the Court has alluded to, this circuit has declined to apply Kingsley outside the excessive force context. Recently, one case I do want to bring to the Court's attention, the Court mentioned Nam Dang. There's also another case in 2017, White v. Cochran, which was a conditions case. In that case, the jail had a sewage leak and inmates had to shower while standing in sewage and surrounded by mold. In that case, the Court specifically addressed Kingsley and also reiterated what the Court held in Nam Dang, that this case, Kingsley dealt with excessive force by correctional officers against inmates, and that has no applicability in this case. Tell me the name of that again. White v. Cochran. Okay. I have it. It's unpublished. I have it as a published opinion, Your Honor. I may be incorrect on that. What's your cite to it? It is 2017 U.S. App Lexus 26588, and there's nothing on the opinion that I printed out that says it's unpublished. I may be incorrect about that. But regardless, Nam Dang addressed this inquiry. In any event, unless Kingsley is made retroactive, it postdates the beating and the death, does it not? That's correct, Your Honor. And that goes towards the clearly established law. We could not use that in this case, could we? You could not, Your Honor, because we're dealing with the issue of qualified immunity and individual defendants. And Kingsley had never been made retroactive by any court. Not that I'm aware of, Your Honor. Certainly not by our court, by the Supreme Court of Georgia, or by the Supreme Court of the United States. That is correct. And in the absence of its retroactivity, it could not be considered. That is my understanding, Your Honor, because the case had to be in existence at the time in order for the supervisory defendants to have notice about it. The only cases they cite to Hale v. Tallapoosa County, Marsh v. Butler County, and McCreery v. Sheriff Jack Palmer to establish, to attempt to establish that these supervisory defendants violated clearly established law, all of the facts of those cases are distinguishable from this case. They involve bullpens with 12-plus inmates where there's no classification systems whatsoever, where inmates are being housed with other murderers, where there was only one jailer on duty, where inmates had access to weapons. The list goes on and on. Those cases are clearly distinguishable, and Judge Thrash was proper in distinguishing those cases in his order. I want to talk now, moving away from clearly established law, to the constitutional violations that are alleged here. As the Court knows, in order to overcome qualified immunity, the appellants have the burden of establishing not only a violation of a constitutional right, but that that right was clearly established. We just talked about clearly established law and how they failed to meet their burden there. Let's talk about the jail conditions that they complain about. They complain about four things, classification, double selling, lack of continuous observation into the cells because there are no video cameras, and the jail they contend is understaffed. The easiest one to dispose of is the double selling. The United States Supreme Court and this circuit has addressed double selling, and it is an okay thing for a jail to be double sold. It does not violate the Constitution. From a classification standpoint, I think it's important that I discuss how the classification process works at the Clayton County Jail. There are two aspects to it. The correct health department does a face-to-face interview, and it was done in this case with Brooks, and he had no physical or mental health issues, no history of violent behavior, no disturbances in mood or behavior, and he scored low on the suicide screening test. So he was entered into general population. Where was the earlier prison disruption involving Brooks? Was that in this prison or a different prison or what? It was in a different jail, Your Honor. It was in the Henry County Jail. The record is clear that no one at the Clayton County Jail had any knowledge about that incident, nor did they have access to the Henry County Jail records. Under our classification system, what the Clayton County intake officer looks at is what are the charges this person is brought into, and also, based on this person's criminal history, their current charges, and their Clayton County Jail history, let's fill out this classification chart and determine whether they should be classified as medium or maximum security. In this case, Mr. Brooks was 19 years old. He was brought in on nonviolent misdemeanor charges. It's undisputed that the intake officer checked his criminal history and checked his Clayton County Jail history, which revealed no violent felonies, no past problems at the Clayton County Jail. He was a pretrial inmate and that he had no escape history, so they selected him as medium security rather than maximum security. That's the classification process. That was done by the face-to-face review by the medical people, or was that done by someone else? That is not done by the face-to-face interview. All right, so take me through it a little bit more slowly. Sure. What is that face-to-face, and then what else happens, and by whom, as reflected in this record? Sure. The face-to-face interview is conducted by correct health to determine whether the inmate should be placed in general population or in the medical infirmary. The classification process completed by the Clayton County intake officer does not involve face-to-face. It involves a review of the records of the person. Before you get to that, what do the face-to-face people do? They interview the inmate coming in, and this is correct health. It was no longer a party in this action. What they do is they interview the inmate. They ask him, do you have any record of any violent history? No. And then they go through a series of tests to diagnose whether this person has mental health issues or not. What tests do they go through? Well, they go through a suicide screening test. It's called a sad person's test. And then they ask the interviewer whether there's any mood or behavioral problems. So then that's correct health. The Clayton County intake officer does not. Do we know from the evidence in the case how long that interview takes? That's not in the record, Your Honor. But we know exactly what they're asked, what they asked. Yes, the correct health defendants, there was a deposition. Their regime, the ones they use, that's in the record. Correct, yes. What the appellants are arguing as far as the classification process is, is that there should be a face-to-face. Before we get to their argument, take your time. You've got the time. I want to know what happens beyond the face-to-face. Who does what in the normal course of events? Sure. Beyond the face-to-face, the Clayton County classification officer then must make a determination, since this person is going to be in general population, whether or not this inmate should be classified medium security or maximum security. In order to do so, they look at several factors. Number one. What's the difference if they classify a medium as opposed to maximum security? That's not in the record, Your Honor. I'm not sure about the additional. Okay. So, nevertheless, that determination needs to be made by the correctional officer. In making that determination, they look at the criminal charges that this person was brought into. They get the GCIC report of this person's criminal history record. They look at that. Then they also look at what's called the Clayton County Jail JC screen to determine whether or not this inmate had ever had any issues in the Clayton County Jail. Based on all of that information, they fill out what's called a classification chart, which is a series of yes or no answers. And they look at, does this person have any violent felony convictions in their past? Yes or no? Had Mr. Brooks ever been in the Clayton County Jail before? I believe he had, but what I'm absolutely certain of is he had no prior discipline history at the Clayton County Jail. They look at whether he had any felonies. Yes or no? Did he have any past problems at the Clayton County Jail? Yes or no? Is he a pretrial inmate? Is he a pretrial detainee, or has he been adjudicated guilty and is going to be confined here? Yes or no? They look at, does he have a risk of escape history? Yes or no? They take this objective classification tree, which tells them whether to put them in medium or whether to put them in maximum. This was a 19-year-old child who was brought in. And that decision tree, that's been sanctioned, hasn't it? Approved by some jailor's association or larger group? Yes. Yeah, absolutely. By the National Institute of Correctional Institutions. Yeah. That the objective classification system. And as far as you know, I presume that that means it's fairly widely used. That is correct, Your Honor. And for purposes of liability, in this case, what we know is there's no cases that have ever held that that system, that classification system, is unconstitutional. Now, what the appellants would have wanted done was, well, the classification system should have been better. There should have been a face-to-face interview. You should have considered his case. Face-to-face by the correctional officer in addition to the health officer. Correct. There should have been this face-to-face interview. And you guys should have considered that he had a misdemeanor charge for a fray. He had a misdemeanor charge for what? A fray. A fray. He had two of them, didn't he? Well, he was convicted for misdemeanor of fray. And a prior arrest, too, for a fray. Maybe I'm wrong. I believe it's just one. I believe it was a prior arrest that got, that the charge got changed to a fray, and he was convicted for misdemeanor of fray. I see. I want to address, first off, there is no constitutional requirement that a face-to-face interview be had at the Clayton County Jail. As far as the misdemeanor goes, under this classification chart, they do not address misdemeanor convictions. And it makes sense because you do not want to put, as they would suggest, someone who had a misdemeanor charge with convicted prisoners in maximum security jail who have been convicted of rape, murder, the egregious crimes that go on and on. This 19-year-old should not have been housed in maximum security with people who have been convicted. When they are housed in maximum security, are they put in individual cells? No, Your Honor. The jail was designed for double-selling. That's the classification process. There is no constitutional requirement that a face-to-face interview be had, and there is nothing that says that this objective classification system, which is used by the National Institute of Correctional Institutions, is unconstitutional. Turning to deliberate indifference, even if there were issues with all of these, the classification, double-selling, the staffing, they must still show deliberate indifference, as the Court has alluded to. Did the individual supervisory defendants, did each one of them know that these conditions were causing inmate-on-inmate fights, and then did they deliberately disregard these risks? There's no evidence of that. And for that reason, the qualified immunity can be granted either by establishing an absence of a constitutional violation or their failure to establish a violation of clearly established law. As far as the Monell claim, I'll just touch on that briefly. Again, there is nothing to show that any of the conditions at the jail were unconstitutional. There's also no evidence that the county knew that any of the jail conditions were causing inmate-on-inmate assaults and did nothing to prevent it. And there's no moving force behind any of the county's customs or policies that led to any constitutional deprivations by Mr. Gruchowski. If there are no questions for me to answer, I'm complete. I have nothing else to say. All right. Thank you. Thank you. I ask that the district court's ruling be affirmed. Thank you. Mr. Batson, you have reserved six minutes. First, there was no — what was done in medical was never conveyed or used by the correctional officers. The medical people asserted HIPAA and said, no, this is medical information. We're not going to give it to you anyway. Our experts both testified — their expert and our expert testified a face-to-face interview with access to criminal record is necessary when you're going to double-sell people. That's the purpose of the lawsuit. But I take it if the medical people in the face-to-face concluded that he was suicidal, had suicidal ideations, they would have done something. They would have put him in medical or something. Does the record reflect how they would respond if they checked positive, suicidal, or checked positive, guy seems violent based on our interview or something like that? Do we know? Do we have an answer to what happens? You say the face-to-face people don't communicate with the classification officer. So what's the value of the face-to-face just to decide whether to put him in a medical unit or not? The face-to-face in the medical is for medical reasons. If the person is committable and meet their standard, then medical does the medical. If he's psychotic, if he's schizophrenic. Correct. Would they notify the classification people of that? They would take the person and handle the medical emergency the way it needed to be handled, which would probably be to isolate them and then take them to do a 1013, which takes them to the Georgia Regional or someplace like that. So the medical evaluation is medical. They wouldn't speak to the classification people? Pardon? They would not communicate to the classification? The classification officer. Let me finish my question, please. They would not communicate with the classification officer what they found if they found some serious mental health problem? I assume that they would do that so that they would not endanger anyone else. However. Is there anything in the record that tells us what they do or don't tell the classification officer? The general principle that they said was we do not reveal any of the medical analysis that we do with the guy to the correctional people. There's a difference between what medical is doing and what correctional people are doing where they have to make the decision about who's going to be housed with whom. And it's been clear since Jones v. Diamond and Fisher. But I would have thought that if they had concerns that a detainee was suicidal, that would be something that wouldn't necessarily keep them in the hospital for the whole pretrial proceeding. I just would have thought they'd put them in some cell with a suicide watch. Have I misapprehended that? Well, we're not, unfortunately, we're not here on a suicide case. I will tell you from having done it. I understand that. I'm just asking. I'm trying to find out what these medical folks do that may be relevant to what the classification folks do and whether there's any communication. No communication. They do nothing that's relevant for the detail of the level that the classification people do. That's the whole point of the case, is that medical had no input and considered no correctional obligations about analyzing whether someone is a substantial risk to the person you're going to be put in a locked cell with where the State has the duty and there's a Supreme Court case that the State has a duty of forethought, obligatory forethought, for the welfare of the prisoner because you're locked in and you're under the control of the State. You can't leave that cell. You can't run away. That's the whole standard of interrogation that comes from the Jailors Association or the Justice Department. Does it talk about any communication between a medical exam information and when and if that should be conveyed to the staffing or the selling decision people? I can tell you directly what my expert says about that, and that is that our medical information should absolutely be made available to correctional people. Well, that's what your expert — my question was what the — this national standard that apparently a lot of jails use, does that address the issue? Well, the issue here for us is — No. Does the national standard, and I'm using that term loosely, but this report, this advisory, does it deal with when a medical examiner should convey information to the cell decision people? I don't think it says when. I think that the issue is you set up your jail so that you do not subject people to substantial risks. And my point — How can we get a copy of this — of this national standard? Is it in the evidence? Is it in the record? There are — there are some standards in there, but I don't remember that particular point being addressed because the way the process works, according to my expert and according to usual conditions, is safety first, correctional decisions first, and to the extent — and I believe there's an exception in HIPAA — that they can convey information to correctional people to protect the safety of others. But the point here is that when you're making a housing decision, just because someone might have a mental — mental problem does not necessarily mean that that's a — something that it may wax and wane when they're doing the medical information thing, but a correctional officer has to make a call. And they — this is a do-nothing case. Everybody else has a correctional officer evaluating whether you put people — whether it's safe to put somebody in a locked double cell, especially these locked double cells. Their experts said it. Our experts said it. They did not do that. Why did they not do that? Because they had nowhere to put them. Even if they did it, they would have nowhere to put them because of the funding. They closed the whole wing of the jail down. Officer Marsh, I ask Officer Marsh. I'll ask if you could just bring your remarks to a conclusion because we're substantially over. But you may ask — answer Judge Hall's question. Do you know where the national standards are in the record? If they are, where would they be? With the expert depositions or? There are standard — there are SOPs and there are some standards that would probably close to our experts' affidavit. Okay. Would be my guess. Thank you. I didn't mean to shut you off right for a minute. If you have a final sentence or so, you — Yeah, I wanted to — Please feel free. I wanted to tell you what — I asked Officer Marsh about whether they ever do any investigation about any of these assaults that come up. And do you ever get down to the root cause? And the response was, no, we don't look at that because there isn't anything we can do about it anyway. And yet our experts are saying everybody does a face-to-face to try to sort out before you put somebody in a cell with somebody else. Do you have any case law at the appellate level, Federal appellate level, that says a face-to-face is constitutionally required? I think that we had a footnote about failure to separate. That's not my question. And certainly if you had a case, you would not put it in a footnote. Jones v. Diamond, Fifth Circuit, should be — I put cases in footnotes when I do it in the string site of Jones v. Diamond, which is a 1979 case. Should a classification policy, which protects pretrial detainees from violent, disturbed, and contagiously ill, that you should have a classification policy? That's not my question. My question is whether there's one that says you have to have a face-to-face. That's what a classification is. That's what they do. That's what classification is. You take the guy's record and you sit down with him and you evaluate him and say, is this guy safe to put here or there? Then that becomes the housing decision. That's what classification is. That's the interview. I think we've got your case. We thank you much. We thank you, counsel, and this Court will be adjourned. Now what?